November 10, 2020

<u>Via ECF</u>

Hon. Lois H. Goodman
United States Magistrate Judge
Clarkson S. Fisher Federal Building
402 E. State Street
Trenton, New Jersey 08608

   Re: *In re: Bank of Nova Scotia Spoofing Litig.*,
     Civil Action No. 20-11059(MAS)(LHG)

Dear Judge Goodman:

  Pursuant to the Court's October 29, 2020 Text Order (ECF No. 16), the parties to the above-referenced action hereby submit this joint letter regarding the discovery dispute set forth in Plaintiffs' letter dated October 28, 2020. (ECF No. 15.)  Pursuant to the Court's Order, the parties have met and conferred concerning the dispute, but remain unable to agree as to the production by the Bank of Nova Scotia Defendants of documents previously produced to government regulators.[1] Both Plaintiffs and Defendants set forth their respective positions below.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

  1. Plaintiffs in the above-captioned action filed complaints against Defendants starting in August 2020. Those complaints allege violations of the Commodity Exchange Act ("CEA") and the common law of unjust enrichment, asserting that Defendants manipulated gold, silver, platinum and palladium futures and options on those futures contracts between January 1, 2008 and July 31, 2016. In particular, the complaints allege Defendants employed the manipulative device known as "spoofing."

  2. The complaints were filed shortly after Defendant The Bank of Nova Scotia ("BNS") entered into a Deferred Prosecution Agreement ("DPA") with the Department of Justice (the "DOJ") concerning trading practices by certain BNS traders in the precious metals markets. *See* Ex. A (DPA).

  3. Defendant BNS separately resolved related issues with the Commodity Futures Trading Commissioner (the "CFTC")

  4. In connection with the DOJ and CFTC investigations, Defendants produced documents to the respective regulators.

---

[1] During this same meet and confer, the parties agreed to exchange proposed ESI protocols and protective orders, which they have done and are in the process of negotiating.

5.      On October 29, 2020, the Court ordered that the cases be consolidated and the deadline for Defendants "to answer or otherwise move with respect to any of the complaints is extended until 45 days after the filing of a consolidated amended complaint." (ECF No. 17, p. 2)

6.      Plaintiffs have proposed to file a consolidated amended complaint 60 days following receipt of the DOJ and CFTC documents.[2]

7.      On October 28, 2020, Plaintiffs submitted a letter to the Court requesting immediate production to Plaintiffs of the Government Productions. The Court directed the parties to meet and confer further and, if necessary, to submit a joint letter concerning that issue.

8.      On Monday, November 2, counsel for Plaintiffs and Defendants held another meet-and-confer on the topic, exchanging their positions. As they were unable to come to a resolution, they now submit their arguments below.

## PLAINTIFFS' POSITION AS TO THE GOVERNMENT PRODUCTIONS

Plaintiffs request that the Court compel Defendants to produce the Government Productions as soon as reasonably practicable, and that Plaintiffs be permitted to file their consolidated amended complaint 60 days after receipt of the Government Productions. Plaintiffs seek a limited and well-defined category of documents that Defendants previously compiled, reviewed and produced for a criminal proceeding, the key facts of which may be encompassed in their entirety by this case. The targeted request is consistent with early-stage requests granted by courts in other class actions that paralleled or followed on government investigations. Plaintiffs at this time are not asking for any further discovery, even though ***there is no stay in place.*** By refusing to produce the Government Productions until after Plaintiffs file a consolidated amended complaint (and after a ruling on any motion to dismiss addressed to that complaint), Defendants here are effectively imposing a stay without showing the good cause required, based primarily on their groundless speculation that Plaintiffs' forthcoming consolidated complaint will be dismissed with prejudice without their ever having produced the disputed documents. *See Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, C.A. No. 12-6090, 2013 WL 2253532, at *2 (D.N.J. May 22, 2013). The mere filing of a dispositive motion does not constitute good cause. *Udeen v. Subaru of Am., Inc.*, 378 F. Supp. 3d 330, 332 (D.N.J. 2019).

In fact, courts generally disfavor staying discovery because delayed discovery creates case management problems and can lead to unnecessary litigation expenses and problems. *See High 5 Games, LLC v. Marks*, 2:13-cv-07161, 2018 WL 4462477, at *2 (D.N.J. Sept. 18, 2018); *Spathos v. Smart Payment Plan, LLC*, C.A. No. 15-8014, 2016 WL 9211648, at *1 (D.N.J. April 25, 2016). Defendants do not even attempt to meet the standard for the drastic remedy of imposing a total stay of discovery. But, more importantly, Plaintiffs at this time are only seeking previously produced, highly relevant documents (the Government Productions) and nothing more.

---

[2]     The documents produced to the DOJ and to the CFTC are referred to collectively herein as the "Government Productions."

Against this very narrow request- even when no stay of discovery is in effect or mandated- Defendants' primary argument has been "burden" – that producing documents that were already culled and produced to the DOJ and to the CFTC will somehow be burdensome. However, in light of their having previously compiled, reviewed and produced the documents, their re-producing them to Plaintiffs will impose a burden on Defendants that is small fraction of the burden imposed by a production from scratch. *See, e.g.*, Transcript of Proceedings re: Conference, *Anastasio v. Total Power North Am., Inc.*, 1:15-cv-9689, ECF No. 78 (S.D.N.Y. July 27, 2016) (rejecting defendants' claims that producing past regulatory productions was disproportionate, finding such an order imposed "very little" burden or cost); *In re Platinum and Palladium Commodities Litig.*, No. 1:10-cv-03617, 2010 WL 11578945, at *1 (S.D.N.Y. Nov. 30, 2010) (request that defendants produce records previously produced to the CFTC "not overly burdensome"); *Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53, 59 (E.D. Pa. 1980) (as to documents previously produced to grand jury, noting that "[s]ince the documents in question have already been identified and sorted, compliance with this request should impose only a minimal burden upon the defendants"). These cases are precisely on point, whereas Defendants cite to a number of cases discussing "fishing expeditions" and general "needless discovery" sought- a far cry from the targeted and limited relevant set of documents sought here.

For these reasons, courts routinely order the production of documents previously produced to the government. *See, e.g.*, Order, *In re Diisocyanates Antitrust Litig.*, No. 2:18-mc-01001, ECF No. 149 (W.D. Pa. Jan. 15, 2019) (requiring defendants' production of documents previously produced to the DOJ prior to plaintiffs filing an amended complaint); *In re GSE Bonds Antitrust Litigation*, No. 1:19-cv-01704-JSR, ECF No. 169 (S.D.N.Y. May 14, 2019) (Civil Case Management Plan ordering DOJ documents to be produced prior to decision on motion to dismiss); *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, No. 08-6324, 2010 WL 11470364, at *405 (D. Minn. Nov. 3, 2010) (ordering production of documents previously produced to government agencies despite burden assertion); *In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01-12257S, ECF No. 161 (D. Mass. Oct. 28, 2002) (ordering production of documents previously produced to federal or state agencies less than two months after various related complaints were consolidated).

Any minimal burden Defendants might face in re-reviewing the Government Production for some further privilege is outweighed by both the indisputable relevance of the documents in the Government Production (*see* Fed. R. Civ. P. 26(b)(1)), and by the waste of resources that would result absent their prompt production. All of the other factors referenced in Rule 26(b)(1)—"the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues"—likewise weigh in Plaintiffs' favor."

As to the importance of the issue at stake in the action, Defendants have acknowledged in the criminal proceeding that their "fraudulent and manipulative trading activity directly and proximately caused…significant harm to the integrity of core United States commodities markets, as well as harm to participants in correlated markets." *See* Information ¶ 8. *See also* DPA ¶ 2 (Defendants acknowledge that "the allegations described in the Information…are true and

Hon. Lois H. Goodman
November 10, 2020
Page 4

accurate"). The amount in controversy in this proposed class action is thus substantial. Defendants alone have access to the relevant information. Defendants' resources are substantial by any measure, and particularly in comparison to Plaintiffs' resources. And whatever Defendants might produce will ultimately be important to the resolution of the entire case.

In addition, Defendants' alleged burden is outweighed by the waste of resources that would ensue absent their re-production of the Government Production. Defendants cannot dispute that the Government Production is overwhelmingly discoverable and highly relevant, as detailed below. If Plaintiffs are required to wait for the Court's decision to receive crucial documents, and only then amend the complaint then on file to add information obtained from the Government Production, the result would cause another round of unnecessary motion to dismiss briefing and drag out the case for months. By contrast, if Plaintiffs receive the Government Production prior to filing a consolidated amended complaint, a large swath of the relevant information would be in that complaint, which would enable the Court to address a single motion to dismiss, based on all of the information that might readily be part of the record at that stage. Defendants' implication to the contrary is without basis.

Moreover, there is no question that the relevance of the Government Production vastly outweighs Defendants burden. There can be no question that these documents are highly relevant because the same conduct underlies both the DOJ and the CFTC investigations and the allegations in Plaintiffs' complaints. But what most distinguishes this case from most civil cases is that Defendants have already admitted to the misconduct at issue. The DPA provides that The Bank of Nova Scotia "admits, accepts, and acknowledges that…the allegations described in the Information and the facts described in the Statement of Facts are true and accurate." *Id.* ¶ 2. The Statement of Facts (which is appended to the DPA) in turn provides that Defendants' violations "involved thousands of instances of unlawful trading in precious metals futures contracts by four traders on three continents between approximately January 2008 and July 2016, resulting in approximately $6,622,190 of loss to other futures market participants and significant harm to the integrity of core United States commodities markets." In the DPA the BNS admitted that, between January 2008 and July 2016, four of their precious metals traders engaged in spoofing of futures transactions in the precious metals markets and agreed to pay a fine of just over $60 million. *Id*. Further, BNS agreed to pay $42 million to resolve the accusations brought by the CFTC regarding their spoofing conduct in the precious metals markets. *In the Matter of: The Bank of Nova Scotia*, CFTC Docket No. 20-27, at 8.

The necessary implication of that admission is that, to a substantial degree, Plaintiffs' claims are not based on mere allegations, but established facts. That overlap is made clear in allegations from Plaintiffs' complaints, as compared with those in the charging document filed in the criminal case and CFTC's Order:

> Between at least January 2008 and until at least July 2016 (the "Class Period"), Defendants Bank of Nova Scotia, Corey Flaum, and John Does 1-25 engaged in fraudulent and manipulative trading practices in connection with the purchase and sale of gold, silver, platinum, and palladium futures contracts ("precious metals futures contracts") traded on the New York Mercantile Exchange ("NYMEX") and

> the Commodity Exchange, Inc. ("COMEX") in violation of the Commodity Exchange Act, 7 U.S.C. §1 et seq. ("CEA") and the common law.

*Sterk v. The Bank of Nova Scotia*, Civil Action No. 20-11059 (MAS)(LHG) (ECF No. 1, ¶1).

> During the [January 2008 until July 2016], four traders employed by THE BANK OF NOVA SCOTIA engaged in fraudulent and manipulative trading practices in connection with the purchase and sale of gold, silver, platinum, and palladium (collectively, "precious metals") futures contracts on and subject to the rules of a registered entity, namely the New York Mercantile Exchange, Inc. ("NYMEX") and Commodity Exchange, Inc. ("COMEX"), which were exchanges operated by the CME Group, Inc. ("CME Group"). The four precious metals traders were (a) Corey Flaum, who was based in New York; (b) Trader 2, who was also based in New York; (c) Trader 3, who was based in London; and (d) Trader 4, who was based in New York until 2012, and thereafter was based in Hong Kong (collectively, "Subject Traders").

*USA v. The Bank of Nova Scotia*, Criminal Case No. 20-707 (MAS) (ECF No. 1, ¶2).

> On thousands of occasions throughout [January 2008 until July 2016], BNS, by and through Corey Flaum, a BNS precious metals trader based in New York, and three other BNS precious metals traders, each of whom acted independently ("Traders"), placed orders to buy or sell certain gold and silver futures contracts traded on the Commodity Exchange, Inc. ("COMEX") with the intent to cancel those orders before execution (*i.e.*, "spoofing"). In doing so, the Traders engaged in a manipulative and deceptive conduct, intentionally sending false signals of supply or demand designed to deceive market participants into executing against other orders the Traders wanted executed. The Traders engaged in this conduct with the intent to manipulate market prices.

*In the Matter of: The Bank of Nova Scotia*, CFTC Docket No. 20-27, at 2 (footnote omitted).

The fundamental overlap between the DOJ's and CFTC's enforcement actions and the Plaintiffs' civil allegations is inescapable, thus demonstrating the obvious relevance of the Government Production and obviating Defendants' claim that they will have to perform a burdensome (self-induced) relevance re-review. *See, e.g.*, *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1027-28 (D. Minn. 1997) ("[T]o the extent that [documents produced to regulators] may lead to discoverable information, Defendants must turn them over."). Without the Government Production, Plaintiffs are at an informational disadvantage in filing a consolidated amended complaint. Additionally, Plaintiffs will be hindered in making informed decisions as to litigation strategy and settlement. *See, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, Master Case No. 14-02567, 2015 WL 11022887, at *4 (W.D. Mo. Feb. 24, 2015) ("[I]n a case involving a concurrent governmental investigation, a stay on discovery of material submitted to a government agency would put the plaintiffs at a comparative disadvantage."). Furthermore, absent

the Government Production, Plaintiffs will be negotiating document preservation and custodians in a vacuum.

Defendants seek to avoid the production altogether based primarily by prematurely litigating entirely speculative issues of standing before an amended consolidated complaint has been filed. But that argument is based strictly on complaints that will become irrelevant upon Plaintiffs' filing of a consolidated amended complaint, the content of which is necessarily unknown to Defendants. Plaintiffs will note that the illustrative examples of spoofing referenced in the soon-to-be obsolete initial complaints are but a fraction of the actual instances of spoofing that occurred during the relevant period. As quoted above, BNS "[o]n ***thousands of occasions throughout [January 2008 until July 2016]*** . . . placed orders to buy or sell certain gold and silver futures contracts . . . with the intent to cancel those orders before execution (i.e., "spoofing")." *In the Matter of: The Bank of Nova Scotia*, CFTC Docket No. 20-27, at 2.

### DEFENDANTS' POSITION AS TO THE GOVERNMENT PRODUCTION

Plaintiffs demand to obtain discovery "immediately" from Defendants The Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotia Holdings (US) Inc., Scotiabanc Inc., and The Bank of Nova Scotia Trust Company of New York (collectively, "BNS Defendants") (ECF No. 15 at 2). Plaintiffs' demand should be denied. Permitting discovery before Plaintiffs file their consolidated amended complaint and before BNS Defendants have an opportunity to test the sufficiency of that yet-to-be-filed pleading would be premature and a waste of judicial and party resources. That is especially true because Plaintiffs' initial complaints fail even to show that Plaintiffs have Article III standing, let alone plead facts plausibly supporting Plaintiffs' claimed entitlement to recover from BNS Defendants. In addition, Plaintiffs' blithe assertion that their demand imposes "little to no burden" on BNS Defendants is simply wrong. *Id.* at 3. On the contrary, the discovery Plaintiffs seek would impose significant burdens that BNS Defendants should not be made to bear before having an opportunity to move against the operative complaint. BNS Defendants respectfully request an order (1) denying Plaintiffs' request for immediate production before an operative complaint is filed; (2) directing Plaintiffs to file their consolidated amended complaint forthwith; and (3) staying discovery until the Court decides BNS Defendants' anticipated motion to dismiss.[3]

Two principal reasons support that result.

*First*, Plaintiffs' discovery demand is premature. As noted, Plaintiffs have stated that they intend to file a consolidated amended complaint (CAC). ECF No. 15 at 2. Thus, the ten complaints currently on file with the Court will be superseded and will not constitute the operative pleadings in this case. Defendants are entitled to an opportunity to test the sufficiency of Plaintiffs' actual

---

[3] BNS Defendants do not intend to waive, and do not waive, any of their defenses, including without limitation any defenses they may have based on lack of personal jurisdiction, requirements for mandatory arbitration, or any other ground, by responding to Plaintiffs' discovery demand as ordered by the Court.

Hon. Lois H. Goodman
November 10, 2020
Page 7

pleading before the case goes forward to discovery, if it ever does. At this point, neither BNS Defendants nor anyone else has even *seen* that pleading.

Requiring Plaintiffs to plead their claims and survive a motion to dismiss before permitting discovery makes sense from a standpoint of both fairness and efficiency. The ten complaints currently on file are facially deficient in multiple respects, raising serious questions about whether Plaintiffs will be able to pursue their claims in this case. If those questions persist once Plaintiffs have filed their amended pleading, they should be answered before BNS Defendants are subjected to the burdens and expense of discovery or required to disclose potentially sensitive confidential information to a group of private plaintiffs.

In particular, and as communicated to Plaintiffs during the meet and confer process, Plaintiffs' ten initial complaints fail to demonstrate that any Plaintiff has Article III standing. That is fatal. To support this Court's exercise of subject matter jurisdiction, Plaintiffs must plead facts showing that they suffered a concrete and particularized injury in fact that is fairly traceable to Defendants' alleged conduct and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Court has an "independent obligation at all stages of the litigation to insure the presence of subject matter jurisdiction." *Franklin Mut. Ins. Co. v. Broan-Nutone LLC*, 2012 WL 12902719, at *1 (D.N.J. Mar. 30, 2012).

Here, Plaintiffs cannot demonstrate Article III standing because, among other things, they have not plausibly alleged the requisite injury in fact. Instead, Plaintiffs plead their own supposed injuries only in the vaguest, most conclusory terms. Plaintiff Robert Charles Class A, L.P., for example, alleges that it "traded at artificial prices throughout the Class Period caused by Defendants' manipulation," but does not describe the type, date, time, size, or direction of even *one single trade* it allegedly made. Compl. ¶ 66, *Robert Charles Class A., L.P. v. Bank of Nova Scotia*, No. 20-cv-13116 (D.N.J.) (ECF No. 1). Neither does any of the other complaints. Plaintiffs possess such information, and could have alleged it if they had chosen to do so. Plaintiffs also possess detailed information, set forth in Defendant The Bank of Nova Scotia's government settlements, concerning multiple trades by The Bank of Nova Scotia—including the nature, direction, date, and time of the trades, down to the millisecond. *See* ECF No. 15-1 at 31-34. But not a single Plaintiff claims to have traded in a market, at a time, and in a direction that would have caused it to be injured by any of the identified trades. The result of Plaintiffs' apparently tactical omission is that there is no plausible basis to conclude that any such injury to Plaintiffs actually occurred.[4]

---

[4] To the extent Plaintiffs believe they require information concerning trading activity that is not described in The Bank of Nova Scotia's government settlements, Plaintiffs (and all other market participants) can obtain such information from the CME Group, which operates the NYMEX and COMEX exchanges on which Plaintiffs claim to have traded. The CME Group, unlike BNS Defendants, maintains a comprehensive database reflecting historical trading on its exchanges. It makes much of that data publicly available through its CME DataMine system (*see generally* https://www.cmegroup.com/confluence/display/EPICSANDBOX/CME+DataMine)

Plaintiffs' lack of Article III standing is only one of several deficiencies evident on the face of the complaints. Another is Plaintiffs' failure to plausibly allege facts supporting statutory standing under the CEA, which requires private plaintiffs to show "actual damages." 7 U.S.C. § 25(a)(1). Another is Plaintiffs' likely failure to plead a basis for this Court to exercise personal jurisdiction over at least some of the claims in this case. BNS Defendants expect to assert yet other grounds in their eventual motion to dismiss.[5] To the extent Plaintiffs contend that they are entitled to discovery to help them correct those deficiencies, that is plainly wrong. The Third Circuit has explained that "discovery is not intended as a fishing expedition permitting the speculative pleading of a case first and then pursuing discovery to support it; the plaintiff must have some basis in fact for the action." *Zuk v. Eastern Pa. Psychiatric Inst. of Med. College of Pa.*, 103 F.3d 294, 299 (3d Cir. 1996); *see also Levey v. Brownstone Inv. Grp., LLC*, 590 F. App'x 132, 137 (3d Cir. 2014) ("factual basis" of pleading "was so thin that it failed to meet even the minimal pleading standard" and thus plaintiff was "plainly not entitled to burden [defendant] with discovery"); *Smith v. Lyons, Doughty & Veldhuius, P.C.*, 2008 WL 2885887, at *5 (D.N.J. July 23, 2008) (purpose of discovery is not to help plaintiff "search[] for evidence in support of facts he has not yet pleaded").

Finally, even if Plaintiffs' claims are not eventually dismissed in their entirety (as BNS Defendants submit should occur), resolution of BNS Defendants' arguments for dismissal before discovery begins will still serve the twin goals of fairness and efficiency. That is because the Court's decision concerning BNS Defendants' arguments will determine which claims survive, and to what extent, and as asserted by and against which parties to the litigation, which in turn will determine the nature and extent of discovery the case requires. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 2007 WL 2127577, at *5 (N.D. Cal. July 24, 2007) (staying discovery where decision on pending motion to dismiss would put parties and court "in a much better position to evaluate how much, if any, discovery to allow"). Proceeding now, in the manner Plaintiffs demand, will needlessly burden BNS Defendants with discovery that may turn out to lack relevance to any viable claim. In contrast, Plaintiffs have articulated no meaningful prejudice to themselves if discovery proceeds after an operative complaint is on file and after BNS Defendants have had an opportunity to test the sufficiency of that pleading.

Plaintiffs argue that their demand to obtain discovery before pleading their claims is "routine," ECF No. 15 at 3, but Plaintiffs are mistaken. In fact, "[d]iscovery in the absence of an operative pleading … does not fit easily within the framework established by the Federal Rules" and "is generally not permitted." *In re Flash Memory Antitrust Litig.*, 2008 WL 62278, at *5 (N.D. Cal. Jan. 4, 2008) (collecting cases). Far more customary is the approach Defendants request, which avoids subjecting the parties to discovery in relation to claims that likely will not survive.

---

and, to the extent Plaintiffs find the DataMine system insufficient to their needs, they are free to request additional data directly from the CME Group by subpoena or otherwise.

[5] To the extent the Court concludes that it should decide the issue of subject matter jurisdiction or any other ground for dismissal available to BNS Defendants now, based on the currently operative pleadings, BNS Defendants respectfully request an opportunity to brief those grounds in full in a motion to dismiss.

*See Mann v. Brenner*, 375 F. App'x 232, 239 (3d Cir. 2010) (affirming stay of discovery pending motion to dismiss because "if the motion is granted, discovery would be futile") (citing *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989) (Rule 12(b)(6) intends to "streamline[] litigation by dispensing with needless discovery"); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997) ("A motion to dismiss based on failure to state a claim for relief should ... be resolved before discovery begins."); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) (permitting discovery before deciding motion to dismiss "defies common sense" because the purpose of Rule 12(b)(6) "is to enable defendants to challenge the legal sufficiency of complaints without subjecting themselves to discovery")); *Newsome v. City of Newark*, 2014 WL 1767562, at *2 (D.N.J. May 2, 2014) (staying discovery where resolution of motion to dismiss on grounds of immunity would "streamline[]" the litigation); *Actelion Pharm. Ltd. v. Apotex Inc.*, 2013 WL 5524078 (D.N.J. Sept. 6, 2013) (staying discovery pending resolution of a dispositive motion).

That is especially so where, as here, jurisdictional and other deficiencies are evident on the face of the complaint and a motion to dismiss likely will dispose of the case. Thus, for example, in *Sepulveda v. United States*, 2014 WL 1344601 (M.D. Pa. Apr. 4, 2014), the court declined to permit discovery before a decision on a motion to dismiss asserting lack of subject matter jurisdiction. The court explained that "[p]arties who file motions which may present potentially meritorious and complete legal defenses to civil actions should not be put to the time, expense and burden of factual discovery until after these claimed legal defenses are addressed by the court," and, further, "[t]his principle applies with particular force to motions to dismiss under Rule 12(b)(1) which raise jurisdictional challenges to a lawsuit." *Id.* at *2. Rather, "[w]hen a motion to dismiss is based on lack of subject matter jurisdiction pursuant to Rule 12(b)(1) … the Court should consider the Rule 12(b)(1) challenge first." *Id*. The same conclusion applies with even more force in this case, where BNS Defendants have not even had a chance to *present* their arguments under Rules 12(b)(1), 12(b)(2), and 12(b)(6), much less obtain a decision on those arguments. *See also, e.g.*, *Boelter v. Hearst Commc'ns, Inc.*, 2016 WL 361554, at *5 (S.D.N.Y. Jan. 28, 2016) (no discovery before resolution of motion to dismiss for lack of standing); *Ellington Credit Fund, Ltd. v. Select Portfolio Servs., Inc.*, 2008 WL 11510668, at *3 (S.D.N.Y. June 12, 2008) (same).[6]

---

[6] The cases upon which Plaintiffs rely in their initial letter of October 28, 2020 and in this joint submission for the proposition that courts "routinely order" early production do not support that proposition. To the contrary, nearly all of the cited cases involve production requests made *after* the filing of an operative complaint, *after* the defendants had an opportunity to raise threshold jurisdictional issues to the court, and/or where *no jurisdictional issues* were raised. *See In re Equifax Inc. Sec. Litig.*, 2018 WL 3023278, at *1 (N.D. Ga. June 18, 2018) (permitting limited "case management and discovery planning," but no document production, *after* plaintiffs filed an operative complaint and where no jurisdictional issues were raised); *In re Broiler Chicken Antitrust Litig.*, 2017 WL 4417447, at *5, *7 (N.D. Ill. Sept. 28, 2017) (noting that "reflexive production of documents previously provided to governmental entities is not appropriate"); *In re Pre-Filled Propane Tank Antitrust Litig.*, 2015 WL 11022887, at *4 (W.D. Mo. Feb. 24, 2015) (granting

---

defendants' motion to stay discovery of documents produced to the FTC pending resolution of defendants' motion to dismiss); *Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc.*, 2010 WL 11470364 (D. Minn. Nov. 3, 2010) (granting in part motion to compel discovery nine months *after* decision on motion to dismiss); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016 (D. Minn. 1997) (granting in part motion to compel discovery *after* deciding motion to dismiss); *see also In re GSE Bonds Antitrust Litig.*, No. 1:19-cv-01704, ECF No. 169 (S.D.N.Y. May 14, 2019) (addressing production request *after* operative complaint was filed and where no jurisdictional issues were raised); *In re Pool Prods. Dist. Mkt. Antitrust Litig.*, No. 12-md-02328, ECF No. 93 (E.D. La. June, 4, 2012) (same); *In re High Tech Employee Antitrust Litig.*, No. 11-cv-2509, ECF No. 88 (N.D. Cal. Oct. 26, 2011) (same); *In re Platinum & Palladium Commodities Litig.*, 2010 WL 11578945 (S.D.N.Y. Nov. 30, 2010) (same); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 1:09-cv-03690, ECF No. 75 (N.D. Ill. Mar. 4, 2010) (same); *In re Tyco Int'l Multidistrict Litig.*, 2003 WL 23830479 (D.N.H. Jan. 29, 2003) (same); *In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01-12257, ECF No. 161 (D. Mass. Oct. 28, 2002) (same); *Golden Quality Ice Cream Co., Inc. v. Deerfield Specialty Papers, Inc.*, 87 F.R.D. 53 (E.D. Pa. 1980) (same). Also unhelpful to Plaintiffs are *In re Liquid Aluminum Sulfate Antitrust Litigation*, No. 16-md-2687, ECF No. 209 (D.N.J. July 5, 2016) (ordering production before an amended complaint where no jurisdictional issues were raised by the initial complaints, there was no indication of a "fishing expedition," and no defendant objected on the basis of burden); *In re Lithium Ion Batteries Antitrust Litigation*, 2013 WL 2237887, at * 2 (N.D. Cal. May 21, 2013) (ordering discovery before filing of consolidated amended complaint where defendants did not object on the basis of burden, staying discovery for defendants who did object on burden, and noting that "[s]tays of discovery may be warranted where a motion to dismiss can resolve a threshold issue such as jurisdiction"); *In re Diisocyanates Antitrust Litigation*, No. 2:18-mc-01001, ECF No. 149 (W.D. Pa. Jan. 15, 2019) (ordering production before an amended complaint where no jurisdictional issues were raised by the initial complaints); and *In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, No. 1:09-cv-03690, ECF No. 75 (N.D. Ill. Mar. 4, 2010) (same). The only case cited by Plaintiffs that involved a standing challenge, *Anastasio v. Total Power North America, Inc.*, No. 1:15-cv-9689, ECF No. 78 (S.D.N.Y. July 27, 2016), is readily distinguishable in that it involved a production request made *after* the plaintiffs filed a *fourth* amended complaint, *after* briefing on a motion to dismiss was nearly complete, and *after* the court stated that it could not "determine that this is a case that will be dismissed on the basis of the motion." Finally, Plaintiffs cite a handful of cases involving requests to stay discovery, but those cases, too, are distinguishable, including because *none* of them contemplated discovery in advance of an operative complaint. Other factors distinguish the four cases as well. *See Udeen v. Subaru of Am., Inc.*, 378 F. Supp. 3d 330, 333 (D.N.J. 2019) (court found delay would result in prejudice to plaintiffs); *Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 2013 WL 2253532, at *3 (D.N.J. May 22, 2013) (court identified no evidence that requested discovery was unduly burdensome); *High 5 Games, LLC v. Marks*, 2018 WL 4462477, at *3 (D.N.J. Sept. 18, 2018) (court permitted discovery where "this case has been pending for too long"); *Spathos v. Smart Payment Plan, LLC*, 2016 WL 9211648, at *1 (D.N.J. April 25, 2016) (court permitted discovery according to schedule taking into consideration defendants' concerns regarding judicial economy and prejudice).

Hon. Lois H. Goodman
November 10, 2020
Page 11

In short, "[a] stay of discovery pending the determination of a dispositive motion is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." *Chavous v. District of Columbia Fin. Responsibility & Mgmt. Assistance Auth.*, 201 F.R.D. 1, 2, (D.D.C. 2001). That sound logic, without more, compels denial of Plaintiffs' premature demand.

*Second*, Plaintiffs' assertions that the discovery they seek will impose "minimal burden," because The Bank of Nova Scotia's prior productions to the U.S. Department of Justice (DOJ) and Commodity Futures Trading Commission (CFTC) (together, Government Productions) can be shared with Plaintiffs "at minimal expense and effort," and will "otherwise be produced later in this litigation" (ECF No. 15 at 2-3) are wrong on all counts. Critically, Plaintiffs' demand assumes that, if this case goes forward, they will be entitled to the entirety of the Government Productions— but there is no basis to assume that. "[T]he compelled act of turning records over to the government pursuant to [a] subpoena does not mean that everyone else has an equal right to rummage through the same records." *In re Graphics Processing Units Antitrust Litig.*, 2007 WL 2127577, at *5.

Instead, if the Government Productions are subject to discovery, BNS Defendants will be required to undertake a burdensome process of review to identify documents and information in relation to which BNS Defendants must object to production. This would not be a "push button" exercise. Instead, the process required would be complex and labor intensive, inasmuch as the Government Productions are voluminous, containing over 1,000,000 pages of material and nearly 1,000 unique audio recordings, and include several types of information whose production BNS Defendants will resist. In particular:

- For certain custodians, The Bank of Nova Scotia produced *all* communications for multiple months with minor exceptions, resulting in production of over 700,000 pages of unfiltered electronic communications. Those materials unquestionably include a large volume of documents and information that lack any relevance to the claims and defenses in this case. Should this action proceed to discovery, BNS Defendants will oppose production of any such irrelevant documents, whose production would not be proportional to the needs of this case.

- The Government Productions include confidential personal information, *e.g.*, personnel files for dozens of BNS employees. Not only is that material highly sensitive, but much of it is, again, irrelevant to the claims and defenses here. Should this action proceed to discovery, BNS Defendants will oppose production of such material.

- The Government Productions include materials that were produced subject to Federal Rule of Evidence 408, as well as privileged material that was produced on a non-waiver basis or was the subject of eventual clawback requests. BNS Defendants intend to oppose production of these materials.

Hon. Lois H. Goodman
November 10, 2020
Page 12

- The Government Productions include significant quantities of confidential commercial information. Again, BNS Defendants will oppose production of such information to the extent that it is not relevant to the parties' claims and defenses, such that its production would not be proportional to the needs of the case.

Analyzing the Government Productions to identify and assert objections concerning production of protected and/or irrelevant material will impose substantial burdens and costs on BNS Defendants. Plaintiffs provide no basis to impose such burdens and costs now, before they file an operative complaint and before dispositive threshold issues can be considered, including the jurisdictional issues described above. In similar circumstances, courts frequently deny discovery. For example, in *In re Term Commodities Cotton Futures Litigation*, 2013 WL 1907738 (S.D.N.Y. May 8, 2013), the court denied a demand for a prior CFTC production where a motion to dismiss was pending and the demand would have required re-review of 90,000 pages of produced documents—which it described as "not an insignificant number." *Id.* at *6. Similarly, in *Nexstar Broadcasting, Inc. v. Granite Broadcasting Corp.*, 2011 WL 4345432 (N.D. Ind. Sept. 15, 2011), the court denied a demand for material produced to a state attorney general where a motion to dismiss was pending and the defendant otherwise would be required to "parse out … relevant and non-confidential information." *Id.* at *4. The result here should be the same.

Respectfully submitted,

| CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C. | WILMER CUTLER PICKERING HALE AND DORR LLP |
|---|---|
| /s/ James E. Cecchi | BROWN & CONNERY, LLP |
| JAMES E. CECCHI | /s/ Susan M. Leming |
|  | SUSAN M. LEMING |

cc:    All Counsel (via ECF)