# EXHIBIT A

689 Fed.Appx. 703

This case was not selected for publication in West's Federal Reporter.

See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.

United States Court of Appeals, Third Circuit.

HAWK MOUNTAIN LLC, a Delaware limited liability company; Gigi Jordan, in her capacity as manager of the Hawk Mountain LLC, and settlor of the Hawk Mountain Trust, and in her individual capacity; Michelle E. Mitchell, Esq., Trustee of the Intercession Trust, beneficiary of the Hawk Mountain Trust; Kim Jordan, in her Capacity as Beneficiary of the Intercession Trust, Appellants

v.

RAM CAPITAL GROUP LLC, a Delaware limited liability company; Ram Realty Holdings LLC, a Delaware limited liability company; Joseph A. Troilo, Jr., Esq.; Bruce Kolleda; *Joseph J. Tropiano, Jr; Bernard Eizen, Esq.; *Mark A. Kovinsky; Joseph T. Molieri, Esq.; Danielle Stewart; Bari Kuo; Renee M. Sigloch; Frederick Forte; Patrick Walsh; Raymond A. Mirra, Jr.; Ram Capital II, LLC; Virginia L. Hall; Shelly Demora

*(Amended per Clerk's Order dated 10/14/2016)

No. 16-3627
|
Submitted Pursuant to Third Circuit L.A.R. 34.1(a) April 6, 2017
|
(Opinion Filed: May 12, 2017)

**Synopsis**

**Background:** Limited liability company (LLC), its manager, and trust that held its membership interests brought action against various alleged fiduciaries, asserting civil claims under the Racketeer Influenced and Corrupt Organizations Act (RICO). The United States District Court for the District of Delaware, No. 1-13-cv-02083, Sue L. Robinson, J., 2016 WL 4541032, granted alleged fiduciaries' motion to dismiss. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held that:

statute of limitations for civil RICO claims began to run on date agreement containing objective storm warnings was executed, and

District Court was within its discretion in denying plaintiffs leave to amend their complaint a third time.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

 **\*704**  On Appeal from the United States District Court for the District of Delaware (D. Del. No. 1-13-cv-02083), District Judge: Honorable Sue L. Robinson

Hawk Mountain LLC v. Ram Capital Group LLC, 689 Fed.Appx. 703 (2017)

RICO Bus.Disp.Guide 12,889

**Attorneys and Law Firms**

Elihu E. Allinson, III, Esq., William D. Sullivan, Esq., Sullivan Hazeltine & Allinson, Wilmington, DE, Allan L. Brenner, Esq., Long Beach, NY, Daniel J. Kornstein, Esq., Elizabeth S. Saylor, Esq., Emery Celli Brinckerhoff & Abady, New York, NY, for Plaintiffs-Appellants

Todd S. Anten, Esq., Nicholas A.S. Hoy, Esq., Nicholas A.S. Hoy, Esq., Robert L. Raskopf, Esq., Quinn Emanuel Urquhart & Sullivan, New York, NY, Kenneth J. Nachbar, Esq., Thomas P. Will, Esq., Morris Nichols Arsht & Tunnell, Wilmington, DE, for Defendant-Appellee Ram Capital Group LLC

Joseph J. Bellew, Esq., Cozen O'Connor, Wilmington, DE, Robert V. Dell'Osa, Esq., Cozen O'Connor, Philadelphia, PA, for Defendant-Appellee Bernard Eizen, Esq.

Sarah E. Aberg, Esq., Robert S. Friedman, Esq., Jeff T. Kern, Esq., Thomas M. Monahan, Esq., Sheppard Mullin Richter & Hampton, New York, NY, John C. Cordrey, Esq., Reed Smith, Wilmington, DE, for Defendant-Appellee Patrick Walsh

Before: CHAGARES, SCIRICA and FISHER, Circuit Judges.

OPINION [*]

FISHER, Circuit Judge.

In a case awash in apparent scandal our ruling today is decidedly ordinary: The plaintiffs' civil claims under the Racketeer Influenced and Corrupt Organizations Act, or RICO, are time-barred. [1] We'll affirm their dismissal.

I.

Gigi Jordan, founder of a successful healthcare business, claims her ex-husband Raymond Mirra and a host of other defendants worked together for years to defraud her out of $225 million. The alleged scheme was fourfold.

**\*705** First, in April 2002 and January 2003 Mirra and others fraudulently opened new Merrill Lynch joint accounts in Mirra and Jordan's names and converted Jordan's personal accounts to joint accounts. Then, forging Jordan's signature on wire-transfer and loan forms, they stole millions of dollars from her. Jordan didn't know about any of it.

Second, between 1996 and 2006 Mirra and others robbed Jordan of her equity in various real properties by fraudulently adding Mirra's name to the warranty deeds and selling the properties off at a premium, all without Jordan's knowledge.

Third, in 2002 Mirra and others lied to Jordan to convince her to create Hawk Mountain Trust and to contribute millions of dollars to it. Jordan's son was to be the beneficiary and two of the defendants—Joseph Troilo and Bruce Kolleda—would serve as trustees. Mirra, Troilo, Kolleda, and others then forged Jordan's signature on numerous documents to wrest control of the trust, after which they siphoned millions of dollars from it and Hawk Mountain LLC, the trust's main asset. When Jordan's son died in February 2010, a dispute over the trust corpus ensued. In 2011 Troilo and Kolleda sought to resolve it in a Pennsylvania state court but the case was dismissed for want of jurisdiction. So Troilo and Kolleda petitioned a Delaware state court for relief in March 2012, attaching the forged trust documents to their petition. Jordan says she incurred legal fees defending against these suits.

Finally, in early 2008 Jordan pursued a business and financial separation from Mirra for which she retained her own lawyer. The split was memorialized in a separation and distribution agreement, or SDA, signed on March 12, 2008. The SDA contained

RICO Bus.Disp.Guide 12,889

"outright lies" and "intentional omissions" concerning the existence and true value of Mirra and Jordan's jointly held companies, real properties, and bank accounts. [2] Jordan says she lost millions of dollars because of it.

Jordan—alongside Michelle Mitchell, Hawk Mountain LLC, and her mother Kimberly Jordan—sued the defendants in the District Court, bringing civil RICO claims. In a thorough report and recommendation the Magistrate Judge found the plaintiffs' RICO claims time-barred. The District Judge agreed and granted the defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). [3] This appeal followed.


II.


The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). We have it under 28 U.S.C. § 1291. We exercise plenary review of a Rule 12(b)(6) dismissal, affirming if the plaintiffs' claims are implausible. [4] For a defendant to prevail on a limitations defense in a motion to dismiss, the plaintiff's tardiness in bringing her claims must be apparent from the materials properly before the court. [5]


III.


A.


The plaintiffs ask us to reverse, contending their civil RICO claims are timely. This  **\*706**  we decline to do. These claims —lodged on December 23, 2013—accrued well before December 23, 2009. They're time-barred under RICO's four-year limitations period. [6]

We adhere to an injury-discovery rule for RICO civil actions: The clock starts when the plaintiff knew or should have known of her injuries. [7] A plaintiff is on inquiry notice of her wounds when the circumstances would have lead a reasonable person to discover them through due diligence. [8] The defendant must point to "storm warnings"—information that would have alerted a reasonable person that misleading statements or significant omissions were probably made. [9] If that happens the plaintiff must show that, heeding those storm warnings, she exercised reasonable diligence but couldn't find and avoid the storm. [10]

We agree with the District Court that the SDA put the plaintiffs on inquiry notice of their alleged injuries no later than March 2008 when the agreement was negotiated and executed. The SDA contained objective storm warnings. Its second page said Mirra and Jordan agreed that "Schedule 2.1.1" set out the assets they held a joint interest in. [11] Among the assets conspicuously listed there were the very Merrill Lynch joint accounts that Jordan says the defendants opened or converted without her knowledge and used repeatedly to steal from her. [12] Schedule 2.1.1 also omitted three real properties—valued at $8 million combined— that the plaintiffs said the defendants fraudulently sold without Jordan's knowledge. [13] These features of the SDA, we think, would have alerted a reasonable person in March 2008 that fraud was probably afoot.

Facing storm warnings the plaintiffs failed to exercise reasonable diligence to attempt to discover their injuries. According to the complaint Jordan did nothing after reviewing the SDA with her lawyer. She didn't, for example, pull her Merrill Lynch account statements or ask to look at documents related to the three omitted properties. Nor does she allege anything that plausibly prevented her from doing so. We reject her conclusory assertion that she should be excused from inquiry notice of these black-and-white SDA provisions merely because some defendants may have been her fiduciaries. In light of what the SDA revealed, the plaintiffs were on inquiry notice of their injuries no later than March 12, 2008, well before December 23, 2009.

Hawk Mountain LLC v. Ram Capital Group LLC, 689 Fed.Appx. 703 (2017)

RICO Bus.Disp.Guide 12,889

The plaintiffs say their fraud allegations stemming from the 2011 and 2012 state-court trust lawsuits render their RICO claims timely against Troilo and Kolleda. We disagree. Even if filing a lawsuit grounded in fraud can be a predicate act under RICO, [14] we agree with the District **707** Court that Troilo and Kolleda didn't commit "*separable*, new" predicate acts [15] in filing these state-court actions. The plaintiffs say Troilo and Kolleda attached forged trust documents—executed in December 2002 and November 2009—to their state-court petitions and referenced them in their pleadings. But Troilo and Kolleda did so, the complaint alleges, to "invoke a judicial imprimatur" on their fraudulent efforts between 2002 and 2007 to seize control of the trust. [16] The plaintiffs can't use new acts as a "bootstrap" to recover for injuries "caused by other earlier predicate acts that took place outside the limitations period." [17] The District Court was right to reject these assertions. The plaintiffs' civil RICO claims are time-barred.

### B.

The plaintiffs end saying the District Court abused its discretion by declining to grant them leave to amend their complaint a third time. We don't think it did. In objecting to the Magistrate Judge's findings that their RICO claims are time-barred, the plaintiffs told the District Court that "[b]ased on ... discovery" they were "confident" they "could prepare a Third Amended Complaint that would fix any defects." [18] But no proposed amended complaint was attached to that filing and the plaintiffs cited only Gigi Jordan's May 2016 responses to interrogatories for support. There Jordan admitted she only "began the process of collecting documents" germane to her claims shortly after February 2010, long after March 2008 when the SDA put her on inquiry notice of her injuries. [19] And when asked what stopped her from discovering her injuries "prior to 2010," Jordan said nothing about what she did after reviewing the SDA with her lawyer in March 2008. [20] The plaintiffs say, correctly, that leave to amend should be granted freely when justice so requires. But it may also be denied where amendment would be futile. [21] Given what the plaintiffs presented in their objections to the Magistrate Judge's conclusions, we see no reason why the District Court here abused its discretion in deeming amendment futile. Dismissal was warranted.

### IV.

For these reasons, we'll affirm the District Court's order.

**All Citations**

689 Fed.Appx. 703, RICO Bus.Disp.Guide 12,889

### Footnotes

| | |
|---|---|
| * | This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent. |
| 1 | 18 U.S.C. §§ 1961–68. |
| 2 | J.A. 331. |
| 3 | The District Court also declined supplemental jurisdiction of the plaintiffs' state law claim for nonpayment of a promissory note. The plaintiffs don't discuss this claim on appeal, so we see no reason to either. |
| 4 | *In re Asbestos Prods. Liab. Litig. (No. VI )*, 822 F.3d 125, 131 (3d Cir. 2016); *see Ashcroft v. Iqbal*, 556 U.S. 662, 677–80, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). |
| 5 | *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 n.13 (3d Cir. 2010). |

Hawk Mountain LLC v. Ram Capital Group LLC, 689 Fed.Appx. 703 (2017)

RICO Bus.Disp.Guide 12,889

6    *See Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006).

7    *Id.*

8    *Id.*

9    *Id.*

10    *Id.*

11    J.A. 371.

12    J.A. 382 (listing the "Account Holder" of these Merrill Lynch accounts as "Joint").

13    *See* J.A. 318–22, 329–30 (complaint alleging the fraudulent sale of three real properties without Jordan's knowledge); J.A. 383 (Schedule 2.1.1 omitting these properties).

14    Some courts suggest it can't. *See, e.g.*, *Bixler v. Foster*, 596 F.3d 751, 758 (10th Cir. 2010); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 (11th Cir. 2004) (citing *United States v. Pendergraft*, 297 F.3d 1198, 1207 (11th Cir. 2002)).

15    *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (emphasis added).

16    J.A. 315, 317–18; *see* J.A. 291–301 (alleging fraudulent transfers from the trust and LLC to the defendants between 2002 and 2007).

17    *Klehr*, 521 U.S. at 190, 117 S.Ct. 1984.

18    J.A. 772.

19    J.A. 781.

20    *See* J.A. 782–84 (describing actions taken only in December 2009 and thereafter).

21    *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014).

---

**End of Document**           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2006 WL 3751911
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

COMMODITY FUTURES TRADING COMMISSION, Plaintiff,

v.

EQUITY FINANCIAL GROUP, LLC, et al., Defendants.

Civil No. 04–1512 (RBK).
|
Dec. 18, 2006.

**Attorneys and Law Firms**

Elizabeth M. Streit, U.S. Commodity Futures Trading Commission, Chicago, IL, for Plaintiff.

Lewis B. Cohn, Witman, Stadtmauer & Michaels, P.A., Florham Park, NJ, Cirino M. Bruno, Gusrae, Kaplan, Bruno & Nusbaum, PLLC, New York, NY, for Defendants.

Vincent J. Firth, Medford, NJ, pro se.

Robert W. Shimer, Leesport, PA, pro se.

**OPINION**

KUGLER, United States District Judge.

**\*1** Before the Court is a motion by Plaintiff Commodity Futures Trading Commission for partial summary judgment against Defendants Equity Financial Group, Robert W. Shimer and Vincent J. Firth with respect to charges that they violated 7 U.S.C. §§ 6k(2), 6m, and 6o (1) of the Commodities Exchange Act, pursuant to Federal Rule of Civil Procedure 56. In addition, Plaintiff moves for summary judgment with respect to the charge that Defendant Shimer aided and abetted Equity's § 6m violation and Tech Traders' violation of 17 C.F.R. § 4.30. For the reasons provided below, Plaintiff's motion will be granted in part and denied in part.

**I. Background**

The motions presently before the Court relate to the role of Robert W. Shimer ("Shimer"), Vincent J. Firth ("Firth") and Equity Financial Group, LLC ("Equity"), (collectively "Equity Defendants"), in a multi-million dollar commodity fraud operated by Defendants Tech Traders and its president Coyt Murray ("Murray"). Between June 2001 and April 2004, Tech Traders allegedly solicited over $47 million in investments by claiming to employ a portfolio trading system that guaranteed significant annual returns. While Tech Traders and its supposedly independent certified public accountant ("CPA"), Defendant J. Vernon Abernethy ("Abernethy"), reported substantial monthly and quarterly gains, Tech Traders was actually hemorrhaging money at a remarkable rate, resulting in losses in excess of $20 million. Tech Traders lost at least $7 million in trading commodity futures contracts, and unlawfully appropriated investors' funds to pay salaries, expenses, and make disbursements under the guise of profit.

The Equity Defendants' liability arises from their control and operation of a related investment group, Shasta Capital Associates, LLC ("Shasta"), which was essentially a feeder fund for Tech Traders. The Commodity Futures Trading Commission ("CFTC"

or "Plaintiff") alleges that the Equity Defendants solicited approximately $15 million from 74 investors between June 2001 and March 2004, for the purpose of investing in Tech Traders. Shasta's Private Placement Memorandum ("PPM") informed investors that 99% of this money would be invested for the benefit of Shasta and 1% would be used for management costs. Upon receipt, investor funds were deposited into Shimer's attorney escrow account and then transmitted to Tech Traders. Tech Traders pooled the Shasta funds with its other investment funds and used them, in part, to trade exchange-traded commodity futures contracts and foreign currency contracts.

Over the course of their relationship with Tech Traders, the Equity Defendants reported tremendous trading profits, even though Shasta actually lost substantial sums through Tech Traders and apparently failed to generate any profit whatsoever. The Equity Defendants further misled investors by representing that these profit numbers were verified by an independent CPA, Defendant Abernethy, whose results were then affirmed by a second CPA, Elaine Teague ("Teague"), a close friend of Shimer's with little experience in this particular field. The CFTC alleges that the Equity Defendants knew or should have known that neither CPA's review was independent and that the results were therefore unverified.

**\*2** Plaintiff filed this motion for summary judgment on April 7, 2006.

## II. Discussion

### A. Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Celotex,* 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2 (quoting *Celotex,* 477 U.S. at 322);*Heffron v. Adamar of New Jersey, Inc.,* 270 F.Supp.2d 562, 568–69 (D.N.J.2003).

### B. 7 U.S.C. § 6m(1)

Plaintiff CFTC alleges that because Equity failed to register with CFTC as a Commodity Pool Operator ("CPO"), Equity violated 7 U.S.C. § 6m(1) when it allegedly used instrumentalities of interstate commerce, such as the telephone and the mail, in connection with its business as a CPO. Equity Defendants do not directly address this count in their opposition papers.[1] Rather, they continue to insist that Shasta is not a "commodity pool," the threshold issue for bringing this action under the jurisdiction of the CFTC.

The Commodity Exchange Act ("the Act") requires a CPO to register with the Commission. 7 U.S.C. § 6n. The Act prohibits unregistered CPOs from "mak [ing] use of the mails or any means or instrumentality of interstate commerce in connection with his business as [a CPO]." 7 U.S.C. § 6m(1).

This Court previously held that Shasta constituted a commodity pool. *See Commodity Futures Trading Comm'n v. Equity Fin. Group,* No. 04–1512, 2006 WL 3359418 (D.N.J. Nov. 16, 2006); *see also Commodity Futures Trading Comm'n v. Equity Fin. Group,* No. 04–1512, 2005 WL 2864784 (D.N.J. Oct. 4, 2005). Likewise, the Court concludes that Equity is the CPO for Shasta, because Equity solicited funds from investors, pooled those funds, and invested them in futures trading through Tech Traders. (Aff. Stephen Bobo at ¶ 5); *see also* 7 U.S.C. § 1a(4) (defining "[c]ommodity pool operator" as "any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds ... for the purpose of trading in any commodity for future delivery ...").

**\*3** Other than disputing that Shasta is a "commodity pool," a question of law already decided by this Court, the Equity Defendants do not raise a genuine issue of material fact to dispute Equity's status as a CPO. In addition, it is undisputed that Equity is not registered with CFTC in any capacity. (Equity Answer to Am. Compl. at ¶ 1.)

The question now before the Court is whether Equity used the mails and other instrumentalities of interstate commerce in connection with its business as a CPO. In his September 24, 2004 deposition, Defendant Firth referenced telephone conversations he had with Mark Munson, a prospective investor in Shasta. (Firth Dep. at 396–98.) In addition, Nicholas Stevenson, a Shasta investor, testified at his February 28, 2006 deposition that he spoke on the phone with Defendant Firth about Shasta before he invested. (Stevenson Dep. at 18–19.)

The evidence demonstrates that Equity, acting as an unregistered CPO, used instrumentalities of interstate commerce, i.e., the telephone, in connection with its business. Therefore, the Court concludes that Equity violated 7 U.S.C. § 6m(1), and the Court grants Plaintiff's motion for summary judgment with regard to this count.

*1. Aiding and Abetting*

Plaintiff also moves for summary judgment on the charge that Defendant Shimer aided and abetted Equity's failure to register as a CPO.

The Act provides that

Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

7 U.S.C. § 13c(a).

Plaintiff asserts that Defendant Shimer "had the requisite knowledge that Equity was a CPO ... because he was a lawyer ... and [had] been registered as an [Associated Person] of a CPO before." (Pl.'s Mem. in Supp. Summ. J. at 33.) Although the evidence supports Plaintiff's assertions regarding Shimer's status as a lawyer and as a registered Associated Person of another CPO, the evidence does not conclusively establish that Defendant Shimer acted willfully. In his deposition testimony, Defendant Firth stated that Defendant Shimer researched whether Shasta, Equity, or any individuals needed to register with CFTC. (Firth Dep. at 112–13.) Firth further testified that Shimer concluded that registration was not required, and his findings were subsequently verified by a "firm." *Id.* Given this evidence, there is a genuine issue of material fact as to whether Defendant Shimer willfully violated the Act by failing to register Equity as a CPO. Therefore, Plaintiff's motion for summary judgment on the aiding abetting count associated with 7 U.S.C. § 6m(1) is denied.

**C. 7 U.S.C. § 6k(2)**

**\*4**  Plaintiff CFTC alleges that Defendants Firth and Shimer violated 7 U.S.C. § 6k(2) of the Act by failing to register as Associated Persons ("APs") of the CPO. In their opposition papers, Defendants again argue only that Shasta is not a commodity pool.

The Act states that it is "unlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves [ ] the solicitation of funds, securities, or property for [ ] participation in a commodity pool ... unless such person is registered with the Commission under this chapter as an [AP] of such [CPO]." 7 U.S.C. § 6k(2).

As stated in Section II.B., *supra,* in prior Opinions this Court established that Shasta is a commodity pool. Moreover, this Court concluded in Section II.B., *supra,* that Equity is a CPO.

The question now before the Court is whether Defendants Shimer and Firth are APs under the Act, and if so, whether they registered with CFTC. Courts define an AP as someone who "engage[s] in the solicitation of customers' orders." *Miller v. Commodities Future Trading Comm'n,* 197 F.3d 1227, 1229 (9th Cir.1999); *see also Commodities Future Trading Comm'n v. Sidoti,* 178 F.3d 1132, 1134 (11th Cir.1999) (defining APs as "salespeople" for the brokerage house).

The record demonstrates that Shimer and Firth acted as APs for Equity. As discussed in Section II.B, *supra,* the deposition testimony of Defendant Firth, as well as Nicholas Stevenson, referenced telephone conversations during which Defendant Firth solicited prospective investors. (Firth Dep. at 396–98; Stevenson Dep. at 18–19.) Stevenson further elaborated that his understanding was that Defendant Firth was the "marketing sales guy" for the CPO, and that Defendant Shimer was not only the "legal representative" for Shasta, but that he also played a "meaningful role getting investors" because he was an attorney, and his credentials made potential investors more comfortable because the investors assumed that Shimer, as member of the bar, performed the proper due diligence. (Stevenson Dep. at 45–46.) In addition, the record demonstrates that Defendant Shimer personally referred potential investors to Shasta. (Pl.'s Exs. 404, 405.)

Finally, the record demonstrates that neither Defendant Firth, nor Defendant Shimer, were registered as APs for Equity. (Pl.'s Ex. 371; Firth Answer to Am. Compl. at ¶ 30.)

Because the Court concludes that Shasta is a commodity pool and that Equity is a CPO, and because Plaintiff presented evidence that demonstrates that Defendants Firth and Shimer acted as salespeople for Equity, without registering with the CFTC as APs, and because Defendants Firth and Shimer raise no genuine issue of material fact in their opposition papers, the Court concludes that Defendants Firth and Shimer violated 7 U.S.C. § 6k(2). The Court grants Plaintiff's motion for summary judgment on this count.

### D. 17 C.F.R. § 4.30

**\*5**  Plaintiff CFTC alleges that Tech Traders was a Commodities Trading Advisor ("CTA") for Shasta because it advised the Shasta commodity pool on trading in commodity futures contracts. Therefore, Plaintiff alleges that by accepting Shasta's funds and trading them in its accounts at Futures Commission Merchants under the Tech Traders name, Tech Traders violated 17 C.F.R. § 4.30.

The threshold issue is whether Tech Traders is a CTA. The Act defines a CTA as

[A]ny person who[:]

   (i) for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in-

Case 3:20-cv-11059-MAS-LHG   Document 49-2   Filed 09/15/21   Page 12 of 24 PageID: 864

Commodity Futures Trading Com'n v. Equity Financial..., Not Reported in...

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market or derivatives transaction execution facility;

(II) any commodity option authorized under section 6c of this title; or

(III) any leverage transaction authorized under section 23 of this title; or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

7 U.S.C. § 1a(6)(A).

In the moving papers, Plaintiff states that Tech Traders was a CTA and then cites to a paragraph in the statement of material facts that does not directly establish the statutory elements necessary to meet the definition of a CTA. (Pl.'s Mem. in Supp. Summ. J. at 34; *see also* Pl.'s SMF at ¶ 9.) Specifically, the material to which Plaintiff cites does not affirmatively demonstrate that Tech Traders received compensation or profit for advising Shasta on its commodities futures trading. [2]

Without establishing that Tech Traders was a CTA in the first instance, the Court cannot decide if Tech Traders violated 17 C.F.R. § 4.30 or if Defendant Shimer aided and abetted that violation. Therefore, with respect to this count, the Court denies Plaintiff's motion for summary judgment.

## E. 7 U.S.C. § 6*o* (1)(B)

Plaintiff alleges that the Equity Defendants violated 7 U.S.C. § 6*o* (1)(B) because they "directly or indirectly employed ... a device, scheme, or artifice to defraud commodity pool participants, or ... engaged ... in transactions, practices or a course of business which operated as a fraud or deceit upon commodity pool participants by means of the acts and practices described above." (Am. Compl. at ¶ 74.)

Section 6*o* (1) of the Act states

It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

**\*6** The purpose of § 6*o* (1)(B) is to "implement[ ] the fiduciary capacity that characterizes the advisor's relationship to his clients." *Commodity Futures Trading Comm'n v. Savage,* 611 F .2d 270, 285 (9th Cir.1980). Therefore, actual registration as a CPO or an AP with CFTC is not required to fall within the ambit of this provision. *Id.* at 282.

Courts hold that while the language of § 6*o* (1)(A) requires a defendant to act "knowingly," § 6*o(1)(B)* does not. *See, e.g., Commodity Trend Serv. v. Commodity Futures Trading Comm'n,* 233 F.3d 981, 993 (7th 2000); *Messer v. E.F. Hutton & Co.,* 847 F .2d 673, 678–79 (11th 1988); *First Nat'l Monetary Corp. v. Weinberger,* 819 F.2d 1334, 1342 (6th 1987); *see also Aaron v. SEC,* 446 U.S. 680, 697 (1980) (interpreting the language "operates or would operate as a fraud or deceit" as "plainly focus[ing] on the effect of a particular conduct"). Rather, the language of § 6*o* (1)(B) prohibits individuals from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client," placing the emphasis on the effect of the prohibited conduct rather than the actor's state of mind. *Messer,* 847 F.2d at 679. Therefore, under § 6*o* (1)(B), a plaintiff need not show that the defendant intended to defraud, but only that the defendant acted intentionally. *Savage,* 611 F.2d at 285 ("If

Case 3:20-cv-11059-MAS-LHG   Document 49-2   Filed 09/15/21   Page 13 of 24 PageID: 865

Commodity Futures Trading Com'n v. Equity Financial..., Not Reported in...

the [CPO] intended to do what was done and its consequence is to defraud the client or prospective client that is enough to constitute a violation of section [6] *o* (1))"; *see also Commodity Futures Trading Comm'n v. Schafer,* No. H–96–1213, 1997 WL 33547409, at *10 (S.D.Tex.1997).

### *1. Firth*

This Court previously held that Defendant Firth acted as an AP for Shasta, a CPO. *See* Section II.C., *supra.* The next inquiry is whether Defendant Firth used the "mails or any means or instrumentality of interstate commerce" to "engage[ ] in any transaction, practice or course of business which operate[d] as a fraud or deceit on "any client or participant or prospective client or participant."

CFTC offers uncontroverted evidence that Defendant Firth, as President and sole shareholder of Equity, reviewed the PPM, which represented to potential investors that Equity, as the Manager of Shasta, conducted due diligence on Tech Trader's results and trading system. (Pl.'s Ex. 49 at 10.) Specifically, Firth signed and distributed the PPM, which assured investors that Equity had "adequate information" about Tech Traders' system and real time trading. The PPM went to potential investors, even though Firth himself had no experience with commodity pool accounting, no training in pool statement preparation, and no experience with back office operations of a commodity pool. (Firth Dep. at 15.) Moreover, Firth never personally reviewed account statements to verify the "good returns" that Defendant Shimer touted on his personal investments with Tech Traders. (*Id.* at 358.) Instead, Firth relied solely on Shimer's representations regarding the soundness of the Tech Traders system. (*Id.* at 358–61.)

**\*7** In addition, the PPM assures independent verification by a CPA, and provides procedures whereby review and verification will take place, but Firth never personally understood how the process worked. (Pl.'s Ex. 49 at 17; Firth Dep. at 368–70.) Rather, he again relied on Shimer's representation that the process was sound. (Firth Dep. at 369.) Further, Firth knew that Shimer himself prepared monthly reports for Shasta that were supposed to originate with Tech Traders. (Firth Resp. to CFTC's Req. to Admit at ¶ 5; Shimer Dep. at 886–91.) The CPA was unaware that these reports were coming from Shimer rather than Tech Traders, and she stated in her deposition that had she known the true source of the statements, she would not have verified the results. (Teague Dep. at 363–65.)

Finally, Firth distributed the PPM via e-mail (Firth Dep. at 170), and he posted, or directed others to post, the "verified" performance numbers from the CPA on the website (*Id.* at 392–93). The Third Circuit established that the internet is an instrumentality and channel of interstate commerce. *U.S. v. MacEwan,* 445 F.3d 237, 245 (3d 2006).

Given the nature of the fiduciary relationship Firth had to Shasta investors, the uncontroverted evidence that he intended to make the above-referenced representations to potential Shasta investors when he signed and distributed the PPM via e-mail and posted the "verified" performance numbers on the Shasta website, and that the PPM had the effect of defrauding or deceiving potential investors, the Court concludes that Firth violated 7 U.S.C. § 6*o* (1)(B), and the Court grants Plaintiff's motion for summary judgment on this count.

### *2. Shimer*

This Court previously held that Defendant Shimer acted as an AP for Shasta, a CPO. *See* Section II.C., *supra.* As with Defendant Firth, the next inquiry is whether Shimer used the "mails or any means or instrumentality of interstate commerce" to "engage[ ] in any transaction, practice or course of business which operate[d] as a fraud or deceit on any client or participant or prospective client or participant."

CFTC offers uncontroverted evidence that Shimer drafted the PPM which touted the Tech Traders' system and performance and established the system for independent verification. (Answer to Am. Compl. at ¶ 42.) However, the verification was flawed, since Shimer himself produced reports for the CPA to verify, when the procedures required that those reports come from the third party trading company. (Teague Dep. at 363–65.)

In addition, there were signs throughout the relationship with Murray and Tech Traders that there was a problem. Teague, one of the CPAs, had ongoing concern that Tech Traders did not provide monthly verification that it had a minimum amount of money in its trading account to cover all investors' deposits to the super fund. (Teague Dep. at 573–74.) This was necessary to ensure that the trader could pay all the accounts in full should the fund close abruptly. (Pl.'s Ex. 470.) In lieu of this verification, Tech Traders would only provide monthly verification that it had enough money on hand to cover Shasta's deposit. (Teague Dep. at 573–74.) Teague found this verification useless and of no consequence because Tech Traders' ability to cover only Shasta's deposit was meaningless since there were other investors to the super fund. (*Id.*) In her deposition, Teague claims she expressed this to Shimer. (*Id.*) Shimer indicated in an e-mail that he did not understand Tech Traders' hesitation to provide the monthly verification, but he accommodated Murray and Tech Traders' on this issue, despite the CPA's protestations, and the concerns of some investors. (Shimer Dep. at 731–32.)

**\*8** Moreover, Murray and Tech Traders repeatedly refused an audit. (*Id.* at 516.) Shimer attributed Murray's hesitation about an audit to his eccentricities, and stated that Murray resisted an audit out of concern that it would reveal his trading methods. (Pl.'s Exs. 446, 447; Shimer Dep. at 1380.) However, the CPA clearly articulated to Shimer that an audit would not reveal any proprietary information. (Shimer Dep. at 1388–89.) Despite this information, Shimer says that he never doubted Murray's reasons for refusing an audit, and gave Murray "some accomodation [sic] because the[ ] numbers were so good." (*Id.* at 1381.)

Because Shimer, who had a fiduciary relationship to Shasta's investors, intentionally ignored the numerous and varied warning signs regarding Tech Traders and Murray, his lack of action had the effect of perpetrating a fraud on Shasta's investors. In addition, Shimer used the internet to post his PPM, as well as unverified performance numbers, on the Shasta website, and he communicated with the CPAs, potential investors, and Murray via e-mail. Therefore, Shimer violated 7 U.S.C. § 6*o* (1)(B), and the Court grants Plaintiff's motion for summary judgment on this count.

### F. 7 U.S.C. § 13c(b)

Plaintiff alleges that Defendants Firth and Shimer are liable for Equity's violations of the Act, pursuant to 7 U.S.C. § 13c(b), because Firth and Shimer "directly or indirectly controlled Equity and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Equity's violations" of the Act. (Pl.'s Am. Compl. at ¶¶ 76, 80.)

Section 13c(b) of the Act states that

Any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

7 U.S.C. § 13c(b).

Although Plaintiff offers evidence to suggest that Defendants Firth and Shimer acted knowingly or in bad faith when they violated 7 U.S.C. §§ 6*o*(1)(B) and 6m(1), Defendants offer contravening evidence regarding the reasonableness of their actions. For example, with regard to the registration count, Defendant Firth asserts that he relied on Defendant Shimer's opinion, apparently verified by an outside firm, that none of the Equity Defendants needed to register with the CFTC. (Firth Dep. at 112–13.) Likewise, Shimer asserts that he reasonably concluded that registration was unnecessary. (Shimer Dep. at 589–92; Pl.'s Ex. 410.)

With regard to the fraud count, Shimer and Firth allege that they were unaware of Shasta's CPA's concerns regarding verification of the rate of return. (Shimer's Resp. to Pl.'s Mot. Summ. J. Exs. E, F.) Similarly, Shimer asserts that it was reasonable for him to rely on the allegedly independent CPA, Abernethy, given that Shimer thought Abernethy was qualified for the job after

he reviewed Abernethy's credentials. (*Id.* Exs. B, F.) Shimer also produced portions of a binder that details the Tech Traders system, which he alleges he reviewed prior to recommending the trading company. (*Id.* Ex. L.) Therefore, Shimer argues that the his representations regarding the system's performance were reasonable. (*Id.*) He further asserts that the same materials were provided to Firth. (*Id.* Ex. L.)

**\*9** These assertions raise a genuine issue of material fact appropriately decided by a jury. Therefore, with regard to the controlling person liability under 7 U.S.C. § 13c(b), the Court denies Plaintiff's motion for summary judgment.

### G. 7 U.S.C. § 2(a)(1)(B)

Plaintiff also alleges that Equity is liable for the acts of Defendants Firth and Shimer under 7 U.S.C. § 2(a)(1)(B), which states

> The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

7 U.S.C. § 2(a)(1)(B).

Courts interpret this provision of the Act to codify the common law principle of respondeat superior. *Rosenthal & Co. v. Commodity Futures Trading Comm'n,* 802 F.2d 963, 966 (7th 1986); *Dohmen–Ramirez v. Commodity Futures Trading Comm'n,* 837 F.2d 847, 858 (9th Cir.1988). Under the common law doctrine, as well as principle liability under the Act, a principal is liable for the torts committed by its agents when the agents act in furtherance of the principal's business. *Rosenthal,* 802 F.2d at 966.

Firth clearly acted as an agent, given that he was the President, and an employee, of Equity. Likewise, Shimer acted as Equity's agent because he was Equity's legal counsel. The violations for which this Court grants summary judgment today, including failure to register under §§ 6m(1) and 6k(2), as well as the fraud count under 6 *o* (1)(B), were all committed while Defendants Firth and Shimer acted as agents of Equity. Therefore, the Court grants Plaintiff's motion for summary judgment with regard to 7 U.S.C. § 2(a)(1)(B).

### III. CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion for summary judgment on the charge that Equity violated 7 U.S.C. § 6m(1); Defendants Firth and Shimer violated 7 U.S.C. § 6k(2); Defendants Firth and Shimer violated 7 U.S.C. § 6*o* (1)(B); and Equity is liable for the foregoing charges against Firth and Shimer under 7 U.S.C. § 2(a)(1)(B).

The Court denies Plaintiff's motion for summary judgment with regard to the charges that Defendants Firth and Shimer aided and abetted Equity's violation of 7 U.S.C. § 6m(1); Shimer aided and abetted Tech Traders violation of 17 C.F.R. § 4.30; and Firth and Shimer violated 7 U.S.C. § 13c(b).

### All Citations

Not Reported in F.Supp.2d, 2006 WL 3751911

## Footnotes

1    In fact, Defendants do not directly address any of the counts for which Plaintiff moves for summary judgment. Rather, Defendants spend the majority of their brief pointing to the immateriality of Plaintiff's evidence, the "abusively overlong" nature of Plaintiff's list of material facts, as well as Plaintiff's alleged distortion of the facts. However, Defendants dispute few of the facts crucial to the counts at issue in Plaintiff's motion.

    Defendants claim that they do not have sufficient space to adequately oppose Plaintiff's summary judgment motion; however, the Court finds that Defendants had more than enough pages to raise genuine issues of material fact with regard to the counts and issues at hand had they not engaged in the digressions listed above.

2    The record in this case is extensive. The Court will not sort through the record to locate citations to support the Plaintiff's motion.

**End of Document**                                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

645 Fed.Appx. 190
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also U.S.Ct. of Appeals 3rd Cir. App. I, IOP 5.1, 5.3, and 5.7.
United States Court of Appeals,
Third Circuit.

Darlene R. McWREATH; Robert McBride; Karen Lundin; Deborah L. McWreath, Appellants

v.

RANGE RESOURCES–APPALACHIA, LLC.

No. 15–1371.
|
Submitted Under Third Circuit
L.A.R. 34.1(a) Nov. 5, 2015.
|
Filed: March 29, 2016.

**Synopsis**
**Background:** Lessors of percentage of subsurface oil and gas rights underlying real property brought Pennsylvania state court action against lessee, asserting claims of conversion, trespass, and accounting in connection with lessee's drilling of wells on property. Following removal, parties cross-moved for summary judgment. The United States District Court for the Western District of Pennsylvania, Nora B. Fisher, J., 81 F.Supp.3d 448, granted summary judgment for lessee. Lessors appealed.

**Holdings:** The Court of Appeals, Vanaskie, Circuit Judge, held that:

oil and gas lease did apply to oil and gas produced from two wells drilled by lessee that tapped into oil and gas reserves partially owned by lessors, and therefore lessors were not entitled to cotenant status and an accounting; and

the district court did not abuse its discretion in denying leave to amend.

Affirmed.

Jordan, Circuit Judge, filed an opinion concurring specially in the judgment.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

 **\*191**  On Appeal from the United States District Court for the Western District of Pennsylvania (D.C. Civ No. 2–13–cv–00560), District Judge: Hon. Nora B. Fisher.

**Attorneys and Law Firms**

David C. Hook, Esq., Hook & Hook, Waynesburg, PA, for Appellants.

Kevin C. Abbott, Esq., Nicolle R. Snyder Bagnell, Esq., Justin H. Werner, Esq., Reed Smith, Pittsburgh, PA, for Range Resources–Appalachia, LLC.

Before: FUENTES, JORDAN, and VANASKIE, Circuit Judges.

OPINION [*]

VANASKIE, Circuit Judge.

Appellants Darlene McWreath, Deborah McWreath, Robert McBride, and Karen Lundin ("the McWreaths") appeal the District Court's grant of summary judgment to Appellee Range Resources–Appalachia, LLC ("Range") on the McWreaths' claim for an accounting, as well as the District Court's denial of leave to amend their Complaint. The McWreaths assert that the oil and gas lease they entered into with Range does not apply to the oil and gas produced from two wells drilled by Range that tapped into oil and gas reserves partially owned by the McWreaths. The McWreaths claimed they were cotenants in the oil and gas estate and sought an accounting of the oil and gas production from these wells. For the reasons discussed below, we hold that the lease does indeed apply to the oil and gas produced from the wells, and therefore, the McWreaths' claims to cotenant status and right to an accounting fail. We also conclude that the District Court did not abuse its discretion in denying leave to amend because the McWreaths did not submit a draft amended complaint, the request was untimely, and the amendment would have been futile. Accordingly, we will affirm the District Court's judgment.

I.

The McWreaths own an undivided partial interest in the oil and gas underlying approximately 1,700 acres of real property in Washington County, Pennsylvania, which they inherited as heirs to the Estate of David R. McWreath. [1] The McWreaths do not have any ownership interests in the surface rights of the property. On September 20, 2007, the Estate entered into a lease agreement with Fortuna Energy, Inc., whereby the Estate granted Fortuna the exclusive rights to explore, develop, and produce the Estate's interests in the oil and gas. The terms of the lease stated that Fortuna would pay the Estate an annual rental fee of $5.00 per mineral acre until oil and gas was produced, at which time the Estate would receive royalty payments equal to 1/8 th of the market value of the oil and gas produced and sold, proportionate to their partial interest.

Fortuna subsequently assigned the lease to Range, which then entered into leases with the remaining two owners of partial interests in the oil and gas, thereby leasing 100% of the oil and gas interests underlying **192** the property. Range also entered into a surface consent agreement with the surface owner of the property that gave Range the right to enter onto the surface of the property and drill wells for its oil and gas exploitation. Thereafter, Range drilled the two Marcellus Shale wells on the property at issue here.

On March 6, 2013, the McWreaths filed this lawsuit in the Court of Common Pleas of Washington County, Pennsylvania, and asserted claims for: (1) trespass, (2) conversion, and (3) an accounting of the oil and gas production from the wells. Range removed the case to the United States District Court for the Western District of Pennsylvania based on the diversity of the citizenship of the parties. The McWreaths did not allege that Range breached the terms of its lease, but rather asserted that the lease was not applicable to oil and gas produced from these two wells. In their view, the lease only gave Range the right to exploit their oil and gas interests when the drilling operations were set up on an adjacent property and not on the surface directly above the McWreaths' oil and gas interests. Because the McWreaths argued that these wells were not covered by the lease, they concluded that they were a cotenant in the oil and gas estate and were entitled to a royalty equal to the gross revenue of any future sales of oil and gas produced from these wells, proportionate to their partial interest. [2]

The parties filed cross motions for summary judgment. The McWreaths conceded that summary judgment should be entered against them on their trespass and conversion claims, leaving only their accounting claim. The McWreaths, however, requested leave to amend their Complaint to add a claim that sought to invalidate the lease with Range. The District Court interpreted the lease and concluded that the lease was applicable to oil and gas produced from the two wells. Because the lease covered

the oil and gas produced from these wells, the District Court held that the McWreaths did not have cotenant status and granted summary judgment to Range on the McWreaths' accounting claim. Additionally, the District Court denied the McWreaths leave to amend their Complaint. The McWreaths timely filed this appeal.

## II.

The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(a). We have appellate jurisdiction under 28 U.S.C. § 1291. Our review of the District Court's order granting summary judgment is plenary. *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.,* 735 F.3d 131, 134 (3d Cir.2013). We view the evidence "in the light most favorable to the nonmoving party." *Id.* at 134–35 (quoting *Kurns v. A.W. Chesterton Inc.,* 620 F.3d 392, 395 (3d Cir.2010)). Summary judgment is appropriate where the movant establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). We review the District Court's denial of leave to amend for abuse of discretion. *U.S. ex rel. Schumann v. Astrazeneca Pharm. L.P.,* 769 F.3d 837, 849 (3d Cir.2014).

## III.

### A.

In Pennsylvania, [3] an oil and gas lease "is in the nature of a contract and is controlled **\*193** by principles of contract law." *T.W. Phillips Gas & Oil Co. v. Jedlicka,* 615 Pa. 199, 42 A.3d 261, 267 (2012). Under Pennsylvania law, "as a general matter, interpretation of a written agreement is a task to be performed by the court rather than a jury." *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 587 (3d Cir.2009) (citing *Gonzalez v. U.S. Steel Corp.,* 484 Pa. 277, 398 A.2d 1378, 1385 (1979)); *see also Standard Venetian Blind Co. v. Am. Empire Ins. Co.,* 503 Pa. 300, 469 A.2d 563, 566 (1983). In construing a contract, "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties," will determine the construction of the agreement. *T.W. Phillips Gas & Oil Co.,* 42 A.3d at 267 (quoting *J.K. Willison v. Consol. Coal Co.,* 536 Pa. 49, 637 A.2d 979, 982 (1994)). Moreover, the "writing must be interpreted as a whole, giving effect to all its provisions." *Atl. Richfield Co. v. Razumic,* 480 Pa. 366, 390 A.2d 736, 739 (1978).

A key provision in an oil and gas lease is the granting clause, which specifies what rights the lessor is conveying to the lessee. *See T.W. Phillips Gas & Oil Co.,* 42 A.3d at 267. Here, the granting clause states:

> [The McWreaths] hereby grant[ ] and lease[ ] *exclusively to [Range] all oil and gas and their constituents,* whether hydrocarbon or non-hydrocarbon, underlying the Leasehold, *together with such exclusive rights as may be necessary or convenient for [Range],* at its election, to explore for, develop, produce, measure and market production from the Leasehold, using methods and techniques which are not restricted to current technology....

(Supp.App. 1.) (emphasis added.) We agree with the District Court that the granting clause: (a) conveyed all of the McWreaths' oil and gas rights in the property; (b) granted Range the exclusive ability to explore for and produce oil and gas; and (c) authorized Range to use any methods or techniques to do so.

Despite the broad grant of rights conveyed in the granting clause, the McWreaths contend that there is "no lease" here. They assert that the lease agreement between the parties is a "Non–Surface Development Lease" that precludes Range from conducting drilling activities on the surface estate directly above their subsurface oil and gas interests. [4] Because the McWreaths

seek complete avoidance of the lease, they must establish that the lease obligations are conditioned upon Range conducting its drilling activities on property other than the surface estate.

To meet their burden of showing that the lease is conditioned upon Range drilling for oil and gas on property other than the surface estate, the McWreaths rely on Paragraph 4 of the lease. This paragraph, in relevant part, provides:

> Lessor and Lessee acknowledge and agree that Lessee is not granted any right whatsoever to: (i) drill a well on any portion of the surface of the Leasehold; **\*194** or (ii) install, construct or locate access roads or pipelines on any portion of the surface of the Leasehold. Accordingly, any lands that have been pooled, unitized or combined with all or a portion of the Leasehold in accordance with the terms of this Lease shall bear the burden of all surface development....

(Supp.App. 2.) According to the McWreaths, the first sentence of this provision indicates that the McWreaths intended to preclude Range from drilling on the surface estate in order to reserve their own implied right to access and use the surface estate, as the owner of subsurface oil and gas interests. Additionally, the McWreaths contend that the phrase "any lands that have been pooled, unitized or combined with ... the Leasehold ... shall bear the burden of all surface development" in the second sentence evidences the parties' intent to restrict the lease's application to wells that were set up on adjacent land. (Supp.App. 2.)

Neither of these arguments is persuasive. In Pennsylvania, the owner of a subsurface estate has an implied right to access and use the surface in order to access what they own. *See Belden & Blake Corp. v. Com., Dep't of Conservation & Nat. Res.,* 600 Pa. 559, 969 A.2d 528, 532 (2009). This right, however, arises by operation of law and is attendant to the subsurface oil and gas. *Id.; see Humberston v. Chevron U.S.A., Inc.,* 75 A.3d 504, 511 (Pa.Super.Ct.2013) ("[T]he law of this Commonwealth is that one who has the right to remove subsurface minerals, also has the right to enter onto the surface and to make reasonable use of a portion of the surface to retrieve his property."). Because the McWreaths conveyed all of their rights in the oil and gas to Range, they had no implied right to access and use the surface. Accordingly, the first sentence of Paragraph 4 cannot be reasonably interpreted as reserving any rights for the McWreaths. Rather, this can only be reasonably interpreted as an acknowledgment that the lease did not grant Range an express right to use the surface estate because the McWreaths did not own any express right in the surface estate. This sentence does not, however, restrict Range from obtaining the express right to use the surface estate from the owner *of the surface estate,* as Range did here.

Next, the phrase "any lands that have been pooled, unitized or combined with ... the Leasehold ... shall bear the burden of all surface development," (Supp.App. 2.), must be read in conjunction with the lease's provision on pooling and unitization. This provision grants Range the sole discretion "to pool or unitize all or any portion of the Leasehold with any other land or lands, whether contiguous or not contiguous." (Supp.App. 3.) Here, Range pooled contiguous property, consisting of the surface estate and the remaining partial interests in the subsurface estate, with the Leasehold. The land that Range pooled with the Leasehold —the surface estate—is bearing the burden of surface development, as required by Paragraph 4. The McWreaths' interpretation that this phrase limits surface development to adjacent lands would only be reasonable if the lease allowed Range to pool the Leasehold *only with adjacent lands.* The express terms of the lease, however, allow Range to pool the Leasehold with "any other land," which in turn must bear the burden of surface development. (Supp.App. 3.)

"[A]n act or event designated in a contract will not be construed as a condition unless that clearly appears to be the intention of the parties." *Lesko v. Frankford Hosp.-Bucks Cty.,* 609 Pa. 115, 15 A.3d 337, 342 (2011) (quoting **\*195** *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.,* 559 Pa. 56, 739 A.2d 133, 139 (1999)). In this case, the lease cannot be reasonably construed to condition its grant to Range on Range conducting its drilling activities on adjacent property. Accordingly, we agree with the District Court that Paragraph 4 does not contain language sufficient for the McWreaths to avoid the lease.

Furthermore, even assuming that Paragraph 4 could be interpreted as precluding Range from drilling on the surface estate, Pennsylvania law would not support the enforcement of such a restriction. Restrictions on property "are not favored by the law" in Pennsylvania because they "interfere with an owner's free use and enjoyment" of the land. [5] *Vernon Twp. Volunteer Fire Dep't, Inc. v. Connor,* 579 Pa. 364, 855 A.2d 873, 879 (2004). Restrictions will typically only be enforced where "a party's actions are in clear defiance of the provisions imposed" and "the restriction is still of substantial value to the owners of the restricted tract." *Id.* at 879–80. As the District Court in this case explained:

> Plaintiffs are seeking to enforce an alleged restriction on Range's use of the surface of land which they (Plaintiffs) do not own on a theory that they retained an implied right to access the surface of the property, despite their grant of all of their partial oil and gas rights to the Lessee (Range) in ¶ 1 of the Lease. Further, all other involved property owners (surface and subsurface) have consented to Range using the property. Under Pennsylvania law, the Lease should be interpreted in favor of Range's free and unrestrained use of the surface of the land rather than precluding such use. It is also doubtful that Plaintiffs could enforce their claimed restraint due to the acquiescence of the surface owner and the cotenants in the subsurface oil and gas rights, all of whom have expressly agreed to Range's activities.

(App. 26.) (internal citations omitted).

We concur with the District Court's analysis. A restriction on using the surface estate is of no value to the McWreaths because they do not own any express rights to the surface estate and no longer have an implied right. Moreover, the owner of the surface estate expressly agreed to allow Range to use the surface estate for drilling activities. Accordingly, even if Paragraph 4 could be interpreted as precluding Range from using the surface estate for drilling activities, the lease should be interpreted in favor of Range's free and unrestrained use in these circumstances.

For all the foregoing reasons, we conclude that the lease between the McWreaths and Range contained an exclusive grant of all of the McWreaths' subsurface oil and gas interests and was not conditioned upon drilling activities taking place on property other than the surface estate. Under the terms of the lease, Range had the right to exploit the McWreaths' oil and gas interests by drilling wells on the surface of the property directly above the McWreaths' subsurface estate. As a result, the McWreaths' claim to cotenant status necessarily fails, and they are not entitled to an accounting under Pennsylvania law. Therefore, we will affirm the District Court's grant of summary judgment in favor of Range on Count Three of the Complaint.

**\*196** B.

Under the Federal Rules of Civil Procedure, "[t]he court should freely give leave [to amend a complaint] when justice so requires." Fed.R.Civ.P. 15(a)(2). Nonetheless, a district court may deny leave to amend a complaint where "it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would unduly prejudice the other party." *Lake v. Arnold,* 232 F.3d 360, 373 (3d Cir.2000). Additionally, the failure to submit a draft amended complaint "is fatal to a request for leave to amend." *U.S. ex rel. Zizic v. Q2Administrators, LLC,* 728 F.3d 228, 243 (3d Cir.2013) (quoting *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 252 (3d Cir.2007)).

Here, the McWreaths sought to add a declaratory judgment action based on the allegation that a Code of Conduct was not presented when the lease was signed in 2007. The McWreaths, however, failed to submit a draft amended complaint in the almost five months between when they first raised the issue and when the District Court denied their request. This failure "is fatal to a request for leave to amend." *See Q2Administrators, LLC,* 728 F.3d at 243; *Fletcher–Harlee Corp.,* 482 F.3d at 252; *Lake,* 232 F.3d at 374. Furthermore, the McWreaths first raised the issue of amending their Complaint fourteen months after the expiration of the deadline established in the District Court's pretrial scheduling order. *See E. Minerals & Chems. Co. v. Mahan,* 225 F.3d 330, 340 (3d Cir.2000) ("We conclude that the District Court acted well within its discretion when it denied Eastern's motion to amend the complaint six months after the amendment and joinder deadlines had expired...."). Finally, the McWreaths' amendment would have been futile because the four-year limitations period for declaratory judgment actions arising out of

contract had run by the time the McWreaths commenced this lawsuit in 2013. *See* 42 Pa.C.S. § 5525; *Algrant v. Evergreen Valley Nurseries Ltd. P'ship,* 126 F.3d 178, 181–82 (3d Cir.1997); *see also In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1332 (3d Cir.2002) (holding that an amendment was futile because the claims would be barred by the statute of limitations). Accordingly, we conclude that the District Court did not abuse its discretion in denying leave to amend.

IV.

For the forgoing reasons, we will affirm the District Court's judgment of January 26, 2015.

JORDAN, Circuit Judge, concurring specially in the judgment.

While I agree with my colleagues on the merits of this case, I would find the entire appeal waived because the McWreaths failed to properly argue for their right to an accounting in their opening brief. It is well-settled in our Circuit that "[a]n issue is waived unless a party raises it in its opening brief." *Laborers' Int'l Union of N. Am., AFL–CIO v. Foster Wheeler Energy Corp.,* 26 F.3d 375, 398 (3d Cir.1994). In the proceedings below, the McWreaths' complaint averred that their lease with Range was invalid and identified three grounds for recovery: trespass, conversion, and accounting. The McWreaths voluntarily dismissed the trespass and conversion claims, leaving only their accounting claim. The District Court determined the lease to be valid and concluded that Pennsylvania law provided no basis for an accounting under any of the theories put forward by the McWreaths.

The McWreaths opening brief in this appeal challenged the validity of their lease with Range, but it did not address in any fashion why the invalidity of that lease would grant them a right to an accounting.  **\*197**  Indeed, there is not a single reference to "accounting" anywhere in that brief. The McWreaths attempted to cure that waiver by filing a "supplemental brief" after Range had filed its answering brief and identified the opening brief's deficiency. We do not consider arguments made for the first time in a reply brief, *In re Surrick,* 338 F.3d 224, 237 (3d Cir.2003), and similarly we ought not consider new arguments made in a supplemental filing that is the functional equivalent of an extra reply brief. (The McWreaths also filed a reply brief after they submitted their "supplemental brief.") Therefore, because the McWreaths' opening brief failed to argue the only appealable issue in this case, I believe the appeal is waived *in toto* and we should not reach the merits.

**All Citations**

645 Fed.Appx. 190

## Footnotes

\*   This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1   The McWreaths own a 33% interest in the oil and gas underlying approximately 1,332 acres and a 66% interest in the remaining 368 acres.

2   It is uncontested that apart from the initial flow-back that was produced at the time Range completed the wells—which Range compensated the McWreaths for under the terms of the lease—neither well is currently producing any oil or gas.

3   Because this case arises under diversity jurisdiction, we will apply the substantive law of the forum state, Pennsylvania. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Moreover, the parties agree that Pennsylvania law applies to this dispute.

4   We reject at the outset, as the District Court did, any notion that the headings "**NON–SURFACE DEVELOPMENT**" and "**NON–DEVELOPMENT LEASE**" are relevant in ascertaining the parties' intent. Paragraph 20 of the lease expressly states: "The headings contained in this Lease are inserted for convenience of reference only and shall not effect [sic] the interpretation or construction of any provision herein." (Supp.App. 4.)

5        Although the oil and gas rights were conveyed by a lease, Pennsylvania courts have stated that "an oil and gas lease, despite the use of the term 'lease,' actually involves the conveyance of property rights." *Nolt v. TS Calkins & Assocs., LP,* 96 A.3d 1042, 1046 (Pa.Super.Ct.2014). As a result, "certain aspects of property law ... are necessarily brought into play." *Id.* (quoting *McCausland v. Wagner,* 78 A.3d 1093, 1100 (Pa.Super.Ct.2013)); *see also T.W. Phillips Gas & Oil Co.,* 42 A.3d at 267.

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.